MASSACHUSETTS DEPARTMENT
OF ENVIRONMENTAL
ENGINEERING, (formerly)
Henry W. KOLBE, M.D.,
MASSACHUSETTS DEPARTMENT
OF PUBLIC HEALTH
vs.
THE CITY OF BOSTON and
THE BOSTON HOUSING
AUTHORITY

No. 95006

Superior Court/Suffolk, ss.
Commonwealth of Massachusetts

December 28, 1982

Francis X. Bellotti, A.G., Raymond G. Dougan, Asst. A.G., counsels for plaintiff.
Robert P. Whitten, counsel for defendant.

## RULINGS, ORDERS AND MEMORANDUM OF DECISION ON THE DEFENDANTS' CROSS MOTIONS FOR SUMMARY JUDGMENT

### Introduction

Defendant Boston Housing Authority's (BHA) "Motion for Summary Judgment as to Liability" asserts the general ground "that there is no genuine issue of material fact and (that it) is entitled to such judgment as a matter of law." In support of its Motion, the BHA relies upon "the affidavits, exhibits and supporting memorandum submitted herewith." In the Introduction to its supporting Memorandum the BHA characterizes its claims against the City as seeking "to enforce its right to require the City of Boston to collect trash, without charge or cost to the BHA, from BHA state and federally subsidized housing developments."

Defendant City of Boston's (the City) Motion for Summary Judgment also asserts that "there is no genuine issue as to material fact and that (it) is entitled to judgment as a matter of law." The City's Motion also explicitly relies upon an accompanying Memorandum of Law. In its Motion the City claims that "under the terms of (their Cooperation Agreement of March 9, 1950) the BHA agreed to make payments in lieu of taxes in return for which the City agreed to provide services including trash collection; (that) the BHA has not made payments in lieu of taxes to the City since 1973 for federally owned projects nor since June of 1980 for state-owned projects; and (that) under the terms of the (Cooperation) Agreement the

City does not owe the BHA trash collection service if the BHA fails to make payments in lieu of taxes."

**Background.**

This action was commenced in March, 1972 as a Bill of Complaint in Equity by the then Commissioner of the Commonwealth's Department of Public Health, since reorganized and redesignated in part as the Department of Environmental Engineering, against the BHA. The Bill of Complaint claimed that the BHA had burned and was burning trash and refuse in incinerators at several of its developments in violation of "Regulations for the Control of Air Pollution in the Metropolitan Boston Air Pollution Control District" previously adopted by the Department. The Bill of Complaint asserted also that the BHA was then in violation of an Order issued by the Department which was directed to the BHA ordering it to cease violations of those Regulations. As the ultimate relief sought by the Bill of Complaint, the Commissioner requested that this Court "Issue a Permanent Injunction enjoining the (BHA) . . . from operating or permitting to be operated any incinerator under (its) control in violation of the Order of the Department, the Regulations for the Control of Air Pollution in Metropolitan Boston, and Chapter 111 of the Massachusetts General Laws."

In June, 1972 the BHA, by a Motion to join the City as a Co-respondent, asserted that "under the terms of the Cooperation Agreement by and between the BHA and the City, entered into on March 9, 1950, the City is required to provide without cost or charge, trash and ash collection and disposal and that, if the BHA is required to cease using its incinerators, the City of Boston will be responsible for trash removal from the BHA's property as required both by the . . . Agreement and c. 27, Sec. 1 of the Revised Ordinances of the City of Boston . . ." That Motion, assented to by the petitioner and allowed by another Justice of this Court, claimed that the City would be a necessary party to any injunction which

may be issued. For the next six years this action remained dormant other than what would be appropriately characterized as some procedural maneuvering. In June, 1978 another Justice of this Court entered judgment against the BHA ordering it to shut down and to discontinue using the incinerators in its developments according to a fixed schedule. The BHA's subsequent request for a stay of that order was denied. Thereafter the BHA both complied with the Order and entered an appeal therefrom which appeal, again aside from some procedural maneuvering, has remained dormant.

**Facts.**

The facts relevant and material to the BHA's claims against the City, to the City's defenses to those claims, and to the parties' cross motions for summary judgment, are set out in the affidavits filed by the parties and are essentially undisputed as follows. The BHA owns and operates or leases 17,661 federally or state-subsidized public housing units for Boston's low-income citizens. In sum, the BHA houses in excess of 10% of Boston's population. A substantial portion of the tenants who reside in housing owned or leased by the BHA receive public assistance and are very poor. Pursuant to federal and state laws, rents paid by the BHA's tenants are limited to a percentage of their income, usually 25%. The average rent paid by BHA tenants, which indicates just how poor those persons are, is approximately $110 in federally-assisted family units, $116 in state-aided family units, $104 in federally-assisted elderly units and $105 in state-aided elderly units. The estimated average monthly cost to the BHA of operating those units is $302 for the federally-assisted units and $359 for the state-aided units.

The federal government paid the original construction costs of the BHA's federally-assisted units and the Commonwealth paid the original construction costs of the BHA's state-aided units. To cover the operating costs of its units in excess of rent paid by its tenants, the BHA in 1982 received

operating subsidies amounting to approximately $30.6 million from the federal government and $9.6 million from the Commonwealth. In the past ten years the BHA has received approximately $152 million from the federal government and approximately $48 million from the Commonwealth for operating subsidies. Also during the past ten years the federal government has granted $45.3 million and the Commonwealth has granted $10.5 million to the BHA for the "modernization" of its developments. During 1980 and 1981 both the federal government and the Commonwealth granted $84 million to the BHA for "substantial rehabilitation" of its developments. Since 1975, both the federal government and the Commonwealth have granted almost $50 million to the BHA for the construction of new family and elderly housing units.

By a contract, designated "Cooperation Agreement" (the Agreement), entered into between the BHA and the City on March 9, 1950 the BHA, among other things, agreed to:

"make annual payments (herein called 'Payments in Lieu of Taxes') in lieu of (real and personal property) . . . taxes and special assessments and in payment for public services and facilities furnished for or with respect to (the BHA's federally-assisted developments) other than water supplied to or provided for such (developments). Each such annual payment in lieu of taxes shall be made (annually) and shall be in an amount equal to either (a) ten percent (10%) of the aggregate Shelter Rent charged by the (BHA) or (b) the amount permitted to be paid by applicable state law."

The Agreement defines "the term 'Shelter Rent' . . . to mean the total of all charges to all tenants . . . of a development for dwelling rents and non-dwelling rents . . . less the cost to the (BHA) of all dwelling and non-dwelling utilities."

Pursuant to the Agreement the City, among other things, agreed

"without cost or charge to the (BHA) on (its) tenants . . . (other than the Payments in Lieu of Taxes) to (a) furnish or cause to be furnished to the (BHA) or (its) tenants . . . (i) the public services and facilities which are at the date hereof being furnished without cost or charge to other dwellings and inhabitants in the City including but not limited to: educational, fire, police and health protection and services; maintenance and repair of public streets, roads and sidewalks, and of sewer systems; garbage, trash and ash collection and disposal."[1]

No Payment in Lieu of Taxes has been made and/or is due to the City from the BHA on account of its federally-assisted developments pursuant to the Agreement since 1975 because the BHA's dwelling and non-dwelling utility costs have exceeded the total of all of its charges to its tenants for dwelling rents and non-dwelling rents in those developments. Accordingly, from 1975 to the present time the BHA has not made any Payment in Lieu of Taxes on account of its federally-assisted developments to the City. In fact, in 1982 the BHA's utility costs for its federally-assisted developments totalled almost $20 million while the dwelling rents charged to tenants in those developments came to approximately $10.5 million.

There is no Cooperation Agreement between the City and the BHA which relates to the BHA's state-aided

---

[1] 24 CFR 841.202(c) requires cooperation agreements to include "the provision at no cost or at no greater cost by the local governing body of the same public services and facilities normally furnished to others in the community."

As an aside, the BHA has had some problems in the past both as to the quantity and quality of police services furnished by the City to all of the BHA's developments. The BHA currently utilizes its allocation of federal Community Block Development Grant funding to purchase additional police services from the City for the BHA's developments.

developments. In other words, the BHA is not required contractually to make annual Payments in Lieu of Taxes to the City on account of its state-aided developments nor is the City obligated by contract to collect and dispose of garbage and ash collection from the BHA's state-aided developments. However, although G.L. c. 121B, sec. 16 expressly exempts the BHA's real estate and tangible personal property from taxation and special assessments,[2] that same section authorizes the BHA to make payments in lieu of such taxes to the City in an amount to be determined by the City.[3] The BHA made such payments in lieu of taxes on account of its state-aided developments to the City through 1979, it made a partial payment in April, 1980, but it has not made any such payments for 1981 and 1982.

The City does not, and has not for some time if ever, either collect(ed) and dispose(d) of or a ⋯ ⋯ the collection and ⋯⋯ of garbage and trash from any of the BHA's developments. Most of the garbage and trash collected at the BHA's developments is collected from dumpsters with a capacity of six cubic yards. The BHA itself pays for the substantial annual cost of such collection pursuant to arrangements entered into between it and private contractors. The cost in 1982 to the BHA for such collection was $635,000. The City either collects and disposes of or arranges for the collection and disposal of garbage and trash from dumpsters of up to six cubic yards capacity from all other Boston residential households, typically situated in multi-family apartment houses, at no cost either to the householders themselves or to the owners of the apartment houses where they reside. The cost to the City of its garbage and trash collection efforts is substantial; up from $294,000 in 1966 to $4,300,000 in 1981. The City's substantially increased costs for garbage and trash collection are due in part to the closing of the City's incinerators in 1975, to the closing of the City's municipal land fill in 1980, and to the very high per-ton

cost of transporting and disposal of garbage and trash to sites outside of the City.

**Rulings and Memorandum of Decision.**

The City makes several arguments in support of its Motion. The City's initial set of arguments responds to what the BHA claims are the City's obligations under the Agreement. The City asserts first that any obligation it may have under the Agreement to collect and dispose of garbage and trash from the BHA's federally assisted developments should not be enforced. The City claims that both federal law and the spirit of the Agreement requires the BHA to make Payments in Lieu of Taxes as a precondition to or in return for the City collecting and disposing or arranging for the collection and disposing of garbage and trash from the BHA's federally assisted developments. The City in support of this argument points to "the burden of public housing on the residents of Boston in comparison to surrounding communities or the state or nation at large." The City asserts that "Boston taxpayers bear a disproportionate burden of the region's and the state's subsidy of low-incoming housing[4] and observes that

---

[2] Both paragraph numbered 3 of the Agreement and 42 USC § 1437d(d) exempt the BHA's federally-assisted developments from real estate and tangible personal property taxation and special assessments.

[3] That amount has been determined to be $97,524 annually.

[4] The City provides statistical support for this conclusion from federal census reports and from other documents. The City notes that while Boston has but 20% of the metropolitan area's population, it houses 40% of its low income persons and 70% of its minority households. Also, although Boston has 24% of the metropolitan area's housing situated within its boundaries, 57% of the metropolitan area's subsidized housing for families is situated in Boston. Finally, while 20% of Boston's housing is subsidized only 7% of the housing in the metropolitan area outside Boston is subsidized.

"the fact that the public housing burden is not evenly shared is considered a major contributing factor to the decline of urban centers."[5] The City concludes its first argument by stating "this Court cannot enforce a contract which by its terms violates the letter as well as the intent of the law and the parties to the Agreement and produces grossly inequitable results."

The City's second argument is a variant of the argument just summarized and asserts that "the remedy of specific performance should be denied since enforcement of the Agreement would be inequitable." The City relies heavily upon the language of Chief Justice Shaw in, **Western Railroad Corp. v. Babcock,** 47 Mass. 346 (1843) where the Court ruled "equity will refuse to interfere . . . when an agreement would operate in a manner different from that which was in the contemplation of the parties when it was executed." The City in effect claims that when the Agreement was executed in 1950 it was contemplated that the City would receive Payments in Lieu of Taxes in return for the municipal services enumerated in the Agreement and that if no such payments are made the City would not be required to collect and dispose of garbage and trash from the BHA's federally assisted developments.

The City's final argument with respect to its obligations under the Agreement is that the BHA should rely exclusively on the self-effectuating relief permitted to it under paragraph numbered seven of the Agreement which provides that:

If the City shall, within a reasonable time after written notice from the (BHA), fail or refuse to furnish or cause to be furnished any of the services or facilities which it is obligated hereunder to furnish or cause to be furnished to the BHA or to any (of its dependents), then the BHA **may** proceed to obtain such service or facilities elsewhere, and deduct the cost therefor from any payments in lieu of taxes due or to become due to the City in respect

to any (development) or any other low-rent housing (developments) assisted or owned by the (BHA) (emphasis added).

No Cooperation Agreement exists between the City and the BHA with respect to the BHA's state-aided developments and the City opposes the BHA's claim that the City is obligated to collect and dispose of garbage and trash from those developments by pointing to the express language of G.L. c. 121B, sec. 16 which provides that:

The real estate and tangible personal property of an operating agency including houses constructed by a housing authority on private land in rural areas under the provisions of section twenty-seven shall be deemed to be public property used for essential public and governmental purposes and shall be exempt from taxation and from betterments and special assessments; **provided, that in lieu of such taxes,** betterments and special assessments, **a city** or town in connection with such a project **may determine a sum to be paid to the city** or town annually in any year or period of years. (Emphasis by the City in its Supplementary Memorandum).

In sum, the City argues that the BHA should bring up-to-date payments in lieu of taxes required to be made by it on account of its state-aided developments before the the City should be required to collect from and dispose of garbage and trash from those developments.

The BHA's arguments meet head-on the points raised by the City. The BHA argues first that both the Agreement and applicably federal law require the City to collect and dispose of garbage and trash from the BHA's federally assisted

[5]The City cites Brookings Institution, **Urban Decline and the Future of American Cities,** 1982 in support of that observation and notes as well that the Brookings Institution has found that "Boston leads the nation as an urban center in decline.

developments irrespective of whether the shelter rent formula yields Payments in Lieu of Taxes. The BHA's next argument is supported by a municipal ordinance which it claims obligates the City "to provide trash collection at all BHA developments." The BHA's third argument is simply that "as a tax-exempt institution, the BHA is entitled to receive those services (garbage and trash collection and disposal) provided to City residents without cost or charge." The BHA's concluding argument is that once it makes payments in lieu of taxes on account of its state-aid developments pursuant to G.L. c. 121B, sec. 16, the City should and must resume collection of and disposal of trash and rubbish from those developments.[6]

On the basis of the undisputed facts set out above, I rule that the BHA is entitled to have summary judgment entered as it requests for the following reasons. On the undisputed facts as applied to the express terms of the Agreement the BHA has no financial obligation to make Payment in Lieu of Taxes to the City on account of its federally-assisted developments. Moreover, the Agreement by its terms just does not make the City's obligation to collect and dispose of garbage and trash depend upon the BHA's making Payments in Lieu of Taxes to the City.[7] This would be the case even assuming, contrary to the facts here, that an application of the shelter rent formula yields a responsibility to make such payments.[8] Further, the City has not provided any factual support for its assertion that it was the intent of the parties originally that the City's and the BHA's obligations under the Agreement would be mutually dependent. Finally, all of the Congressional legislative history relevant to this issue indicates beyond any question that the **quid pro quo** to the city for its municipal services was not Payments in Lieu of Taxes but rather federally financed housing for the City's poorest citizens.

In 1977, Congress requested HUD to study the status and adequacy of

Payments in Lieu of Taxes. Housing and Community Development Act of 1977, Pub. L. No. 95-128, Section 201(g). The study entitled "Payments in Lieu of Taxes: A Status Report" (1979) ("PILOT Report) notes that PILOT payments represent a form of local assistance. "Historically, payments in lieu of taxes for public housing has been a method of assuring local assumption of some share of public housing costs . . . PILOT does not cover the full costs of municipal services rendered to the housing projects, nor does Congress ever intend that it should. Within the Federal-local cost sharing framework, PILOT was expected to offset only a portion of the local cost-share of tax exemption and service provision." PILOT Report at 3, 5.

In sum, the City's legal arguments, which focus both on the provisions of the Agreement and a misperceived sense of Congressional legislative intent, are

---

[6]Not argued by the BHA is the interesting assertion by the Chief of the Financial Management Procedures Branch in HUD's Office of Public Housing in his Affidavit in support of the BHA's Motion that "Many cities functioning under Cooperation Agreements including Boston, Philadelphia, Chicago, New Haven, Jersey City, Newark, Trenton, Washington, Baltimore, Chester City (Pa.), Harrisburg, Louisville and Detroit received no payments in lieu of taxes from local housing authorities in 1982 . . . because total utility costs exceed shelter rent . . . thereby resulting in no payment due . . . I have no knowledge of any city functioning under a Cooperation Agreement reducing services to public housing authority developments based on a reduction of Payment in Lieu of Taxes."

[7]The Supreme Judicial Court has declined to construe provisions in contracts as creating mutually dependent conditions unless there is a "clear provision" which makes the duty "directly contingent" upon some act. **A. J. Wolfe Co. v. Baltimore Contractors, Inc.,** 355 Mass. 361, 365-6 (1969).

[8]The City appears to suggest that this Court declare illegal a definition of the term shelter rent which has been for over 30 years consistently applied nationally in the manner argued by the BHA to public housing programs.

misplaced. So also is the City's appeal to equity.[9] While the City's costs for collection and disposal of garbage and trash have escalated, the federal taxpayer, who picks up the difference between the cost of BHA federally-assisted housing and what its tenants, who typically are Boston's poorest citizens, can pay, has also suffered the ravages of inflation. While the City's complaint, statistically supported, that Boston in effect shelters most of the region's poor is a good one, it is not an appropriate response for the City to penalize the poorest of Boston's poor who live in the BHA's developments.[10]

The City's remaining arguments articulate essentially variants on the same theme as its first argument and compel the same responses just made. The City's final argument that the BHA should opt for the self-effectuating relief in the Agreement misses the point that the BHA by pressing the issue has turned down that option. In sum, I rule as a matter of law that the Agreement compels the City to collect and dispose of garbage and trash from the BHA.'s federally-assisted developments and as a matter of equity that the City should provide the same garbage and trash collection and disposal services to its poorest citizens that it provides to its more affluent residents.

As to its state-aided developments, in support of its Motion, the BHA correctly points out that "the City is obligated by ordinance to collect BHA trash from state and federal projects without cost or charge (and that) this obligation exists independent of the City's duties under the Cooperation Agreement." City of Boston Code, Ordinances, Title, 11, sec. 150, requires that . . .

There shall be in the city a . . . Public Works Department .which . . . shall remove and dispose of the following classes of refuse from dwelling houses and from housekeeping apartments of tenants, when it is placed in yards or areas so as to be easily removed, free of charge to the producers of such refuse and to

the owners and occupants of such dwelling houses, apartments and tenements . . . (garbage and trash as described by category) . . . But the Department shall not be required to take any such refuse from hotels, apartment hotels, restaurants, shops, stores, or from any other building whatsoever except those first hereinbefore enumerated and except buildings occupied by the city.

The language of that section provides unequivocally that the City is obligated to collect garbage and trash generated by persons who reside in Boston from housing where they reside irrespective of how such housing might be characterized and/or categorized, e.g., as private or as public, as multi-family or single family, as middle-income or low-income. Also, the City's responsibility to collect and dispose of garbage and trash, which is mandated by its own ordinance, is required, in the

---

[9]However, this is not to suggest that the City's appeal to equity is groundless. A Senate Report on the legislation requiring HUD to study the PILOT problem provided:

The Committee is concerned that the success of the public housing program may be jeopardized by a failure to provide adequate payments in lieu of taxes. It recognizes that the Federal Government, in the Section 8 leasing program, provides for the full payment of property taxes, while providing for only a fractional payment under the conventional (public) housing program. It believes that a new evaluation of the PILOT program is needed in light of the impact of the rent-to-income ceilings, the rapid increase in taxes, utilities and other operating costs, and the implementation of new housing assistance programs.

S. Rep. No. 95, 95th Cong. 1st Sess. 21-2 (1977).

[10]The City's most devastating point, also statistically supported, is that sheltering most of the regions' poor persons results in Boston being less financially able to do so. Federally compiled statistics indicate that the ability of most Bostonians to keep up with inflation fell far behind that of the ability of residents of the region outside Boston to cope with inflation. By not assisting Boston in housing the region's poor, communities outside Boston serve to widen the economic disparity between their residents and the residents of Boston.

112

case of public housing, whether or not the BHA makes payments in lieu of taxes to the City pursuant to G.L. c. 121B, sec. 16; and, in the case of private housing, whether or not the owners or residents of such housing make payments of real property taxes to the City.

In conclusion, this Court cannot improve upon the final point made by the BHA in its Reply Memorandum where the author states:

> Finally, the City's increased trash collection and disposal costs and its other general problems cited in its Memorandum are beside the point. Public housing residents' right to the basic municipal service of trash collection is guaranteed both by municipal ordinance and, for the federal developments, by the Cooperation Agreement. Just as changes in the City's costs and other circumstances do not negate other Boston residents' rights to trash collection, such circumstances should not be held to negate those rights with respect to public housing residents.

**Order.**

On the basis of the above Rulings, I order the BHA's Motion allowed and the City's Motion denied. I order judgment to enter declaring that the City is obligated to collect and dispose of garbage and trash from the BHA's federally-assisted and state-aided developments and I order the City to do so effective February 1, 1983. Should the City determine that it is not possible to comply with this Order it is to reimburse the BHA monthly for the BHA's cost of collecting and disposing of garbage and trash from its developments.

I leave to another day both a determination of monies owed by the City to the BHA as a consequence of the City's past failures to comply with its obligations pursuant both to the Agreement and to City of Boston Code, Ordinances, Title 11, sec. 150 and a determination of monies owed by the BHA to the City pursuant to G.L. c. 121B, sec. 16.

Paul G. Garrity
Justice of the Superior Court